BRANDON CORPORATION *v.* UNITED STATES (No. 4432)[1]

150

United States Court of Customs and Patent Appeals, December 8, 1943

*Joseph H. Choate, Jr.*, for appellant.

*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel) for the United States.

[Oral argument October 5, 1943, by Mr. Choate, Jr., and Mr. Rao]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

Appellant imported at the port of New York certain reed space looms and parts thereof used to weave paper-maker's fabrics, dryer felts or mats, from cotton and asbestos yarn. The importations were made in 1940, which was subsequent to the effective date of the trade agreement with the United Kingdom, i. e., January 1, 1939—T. D. 49753.

The collector classified the merchandise as dutiable under the provisions of paragraph 372 of the Tariff Act of 1930, and assessed the same with duty at the rate of 40 per centum ad valorem. The pertinent portion of paragraph 372 reads as follows:

PAR. 372. * * * lace-making machines, machines for making lace curtains, nets and nettings, 30 per centum ad valorem; knitting, braiding, lace braiding, and insulating machines, and all other similar textile machinery, finished or unfinished, not specially provided for, 40 per centum ad valorem; all other textile machinery, finished or unfinished, not specially provided for, 40 per centum ad valorem; * * * *Provided*, That parts, not specially provided for, wholly or in chief value of metal or porcelain, of any of the foregoing, shall be dutiable at the same rate of duty as the articles of which they are parts * * *..

Appellant, in actions instituted by protests, sought to recover a portion of the amount of the customs duties exacted, claiming that

the merchandise was dutiable at only 20 per centum ad valorem under the first clause of the hereinafter-quoted provisions of the aforesaid trade agreement. Those provisions read as follows:

| Tariff Act of 1930; paragraph | Description of article | Rate of duty |
|---|---|---|
| 372 | *Textile machinery*, finished or unfinished, not specially provided for, *for textile manufacturing or processing prior to the making of fabrics* or woven, knit, crocheted, or felt. articles not made from fabrics (except worsted combs, bleaching, printing, dyeing, or finishing machinery, and machinery for making synthetic textile filaments, bands, strips, or sheets) | 20% ad val. |
| 372 | *Textile machinery*, finished or unfinished, not specially provided for, and not provided for heretofore in any item numbered 372 in this schedule (except worsted combs, machinery for making synthetic textile filaments, bands, strips, or sheets, *looms*, or bleaching, printing, dyeing, and finishing machinery, and not including any article of a class or kind with respect to which United States import duties have been reduced or bound against increase pursuant to any trade agreement heretofore concluded under section 350, Tariff Act of 1930, as amended) | 25% ad val. |
| | *    *    *    *    * | |
| 372 | Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any articles provided for in any item numbered 372 in this schedule, shall be dutiable at the same rate of duty as the articles of which they are parts.   [Italics ours.] | |

The United States Customs Court, Second Division, overruled the protests, and from its judgment the importer has here appealed.

The issue presented here on appeal involves a question of law only, viz, that of the construction of the trade-agreement provisions hereinbefore quoted. It is not disputed that the looms and parts involved are textile machinery or parts thereof and that unless the quoted provisions of the trade agreement include the instant merchandise, it is properly dutiable as assessed.

It is pointed out in the brief of counsel for appellant that provisions of the trade agreement, which immediately precede the provisions here under consideration, reduced the duty provided in paragraph 372 of the Tariff Act of 1930 on "Lace-making machines, and machines for making lace curtains, nets, and nettings (except Levers or go-through lace machines)," "Circular knitting machines, finished or unfinished," and "Braiding, lace braiding, and insulating machines, and all other similar textile machinery, finished or unfinished, not specially provided for," and, it is argued by counsel, that the provisions here under consideration "(save only as to the specifically excepted items)" were intended as a complete substitute for the provision

contained in paragraph 372 of the Tariff Act of 1930 for "all other textile machinery, finished or unfinished, not specially provided for, 40 per centum ad valorem."

It is further contended by counsel for appellant that the language "for textile manufacturing or processing prior to the making of fabrics," contained in the first clause of the provisions here under consideration, is clear and unambiguous; that it was intended to cover all textile machinery, except such as was expressly excepted therefrom, used in the *manufacture* of *textile materials*, including *textile fabrics,* as well as machinery used in the *processing* of *textile materials prior to the making of fabrics;* that the second clause of the trade agreement here under consideration was intended to cover all textile machinery, except such as was specifically excepted therefrom, "not properly describable as for textile manufacturing or processing"; and that all textile machinery, not otherwise specially provided for in the trade agreement, was intended to be covered by one or the other of those two clauses, "unless specially excepted from *both.*" [Italics quoted.] Furthermore, it is the view of counsel, as stated in his brief, that—

The clear effect, and evidently the intended effect of the Trade-Agreement was, thus, to reduce the duties on every textile machine covered by the tariff act, other than machines specifically excepted.

In support of his contention that the first clause of the trade agreement here under consideration was intended to cover textile machinery used in the manufacture of textile materials, including textile fabrics, as well as machinery used in the processing of textile materials prior to the making of fabrics, counsel for appellant states in his brief that the term "processing," as used in the phrase "textile manufacturing or processing prior to making," was intended to mean something different from the word "manufacturing"; that it was intended to enlarge, rather than to narrow, the scope of the provision in question; that, had not the term "processing" been employed, the provision might have been construed "as not covering machines which operate. before textile manufacturing, in a narrow sense, begins"; that "Endless questions would have arisen as to whether particular preliminary machines processing raw materials, prior to the first steps of spinning or weaving, were 'machines for textile manufacturing' "; and that the words "textile manufacturing" must have been regarded by the framers of the trade agreement as meaning something different from the language "processing prior to the making of fabrics."

It is also argued by counsel for appellant, in support of his construction of the first clause of the provisions here under consideration, that by expressly excepting from the operation of that clause printing and finishing machines and machines for making synthetic textile bands, strips, and sheets, none of which, it is contended, is used in

textile manufacturing or processing prior to the making of fabrics, the framers of the trade agreement must have had in mind that those machines would be covered by the provision for "textile manufacturing or processing prior to the making of fabrics," unless expressly excepted therefrom. By that argument, counsel, in effect, invokes the well-established principle of statutory construction announced by the Supreme Court in the case of *Brown* v. *Maryland*, 12 Wheat. 419, 438, and repeatedly applied in proper instances by this and other courts, that the express exception of a particular article or thing from a general provision indicates that, had the exception not been made, the article or thing expressly excepted would, in the opinion of the lawmakers, be covered by the general provision.

Counsel for the Government contends, and the court below held, in substance, that the language contained in the first clause of the provisions here under consideration is not doubtful in meaning; that it should be read as written; and that the phrase "for textile manufacturing or processing prior to the making of fabrics" was not intended to apply to machinery used either in the manufacture or processing of fabrics, but was intended to apply only to such textile machinery as is used in manufacturing or processing textiles prior to the use of such textiles in the making of fabrics. It is agreed, however, by counsel for the Government that the term "processing," as used in the provision "for textile manufacturing or processing prior to the making of fabrics," was intended to enlarge the scope of the provision to cover machines used in the advancement of textile materials to a degree or extent less than that implied by the proper use of the term "manufacturing."

Counsel for both parties call attention to the fact that, in addition to the machines expressly excepted from the first clause of the provisions here under consideration, the second clause of those provisions also expressly excepts looms from its operation. In this connection, counsel for the Government contends that if it was intended to provide for looms in the first clause, it was unnecessary to expressly except them from the second.

Certain facts were submitted by stipulation. They need not be set forth here. Among such facts is the statement, in substance, that, on or about the time of entering into the trade agreement and prior thereto, the importations of looms from the United Kingdom were few in number compared with the number of looms produced in the United States. Counsel for appellant argues that since the importations at that time were negligible, less protection was needed on looms, and that the contracting parties sought to lift what amounted to practically a "total embargo." We do not think that the fact that comparatively few looms were imported into the United States from the United Kingdom at the time of entering into the

trade agreement justifies the conclusion urged here by counsel for appellant.

At the time of entering into the trade agreement, the negotiators thereof were, of course, aware of the fact that the term "textile machinery," as used in paragraph 372 of the Tariff Act of 1930, covered machinery used in the manufacture of textiles, such as textile fibers, filaments, yarns, and fabrics. See *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T. D. 41490; *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916; *Jett & Co.* v. *United States*, 18 C. C. P. A. (Customs) 86, T. D. 44044; *United States* v. *Samuel Shapiro & Co.*, 18 C. C. P. A. (Customs) 165, T. D. 44374; *Edward Jefferson (Inc.)* v. *United States*, 18 C. C. P. A. (Customs) 322, T. D. 44583; *United States* v. *Columbian Rope Co.*, 22 C. C. P. A. (Customs) 143, T. D. 47110. Accordingly, had they intended to include in the first clause here under consideration textile machinery used in the manufacture of fabrics, as well as machinery used in the processing of textile materials prior to the making of fabrics, they undoubtedly would have provided therein for "Textile machinery, finished or unfinished, not specially provided for, including machinery for processing textile materials prior to the making of fabrics." That they did not do. On the contrary, so far as the issue here is concerned, they limited the provision to "Textile machinery" used "for textile manufacturing or processing prior to the making of fabrics," and, by so doing, made manifest their intention of excluding therefrom textile machinery, such as looms, used in the manufacture of fabrics. Furthermore, had the negotiators of the trade agreement thought that the language contained in the first clause here under consideration covered looms, they certainly would not have deemed it necessary to expressly exclude looms from the second clause.

It is true, as argued by counsel for appellant, that some of the machines, such as bleaching, printing, dyeing, and finishing machines, expressly excepted from the operation of the first clause of the trade agreement here under consideration are used in manufacturing or processing textile fabrics. However, bleaching, printing, dyeing, and finishing machines are also used in manufacturing or processing textile materials *prior to the making of fabrics*. The bleaching and dyeing of yarn and other textile materials prior to their use in the manufacture of fabrics is so well known as to require no citation of authority.

Printing machines are employed in the textile art for printing or stamping figures or designs on textile fabrics. However, yarns which are to be used in the making of fabrics are often subjected to a process which, in the textile art, is termed "printing." In the American Wool Handbook, First Edition, written by eminent authorities, much is said about the printing of yarns before weaving. On page 657, under

the heading "Velvet and Tapestry Carpets and Rugs," we find a discussion of this subject. We quote therefrom as follows:

As has already been stated, some Velvet and Tapestry fabrics are woven with a pattern. To accomplish this, the white yarn is printed with the desired color before weaving.

White yarn is wound on large cylinders or drums. The circumference of the drum is equivalent to the length of the yarn necessary to weave one warpwise row in the length of the rug, or for one pattern repeat in the carpet. The drums range from 4–18 feet in diameter. The yarn is wound in such a way that the strands of yarn lie side by side in a single sheet across the entire width of the drum. One drum of yarn must be printed for each warpwise row in the width of the fabric.

Finishing machinery is used to give "handle, weight, strength, appearance, lustre, or some other property" to woven fabrics. See Glossary of Textile Terms, 1921, by H. P. Curtis, p. 110. The same authority defines·the term "finisher" as—

The name of a machine used by spinners for the further removal of impurities from cotton following the scutcher and preceding the carding engines.

There are also machines for finishing or conditioning yarns. For example, hygrolit machines are used to spray yarn with a so-called "Hygrolit solution" for the purpose of conditioning or preparing the yarn for use in knitting or weaving and giving it elasticity and strength. The use of the solution also lessens the tendency of the yarn to kink by "setting the twist." See *United States* v. *American Textile Engineering, Inc.*, 26 C. C. P. A. (Customs) 48, T. D. 49597.

It is unnecessary for us here to determine the meaning of the terms "printing machinery" and "finishing machinery" as ordinarily used in the consideration of tariff statutes. Those terms are used in the textile art in the manner hereinbefore stated. Whether the negotiators of the trade agreement used them according to their common meaning or out of an abundance of caution, is immaterial.

Although synthetic textile bands, strips, and sheets may at times be used as fabrics, they are, for tariff and commercial purposes, more frequently considered and used as material in the manufacture of textiles.

The Congress, in paragraphs 1305 to 1309, inclusive, 1312, and 1313 of the Tariff Act of 1930, has distinguished fabrics made of synthetic textile materials from synthetic textile bands, strips, and sheets. Paragraph 1305 provides for "Rayon or other synthetic textile in bands or strips not exceeding one inch in width, *suitable for the manufacture of textiles.*" [Italics not quoted.] Paragraphs 1306 to 1309, inclusive, provide for fabrics composed wholly or in chief value of rayon or other synthetic textile, paragraph 1306 providing for woven fabrics in the piece, paragraph 1307 for pile fabrics and articles made therefrom, paragraph 1308 for fabrics with fast edges and articles made therefrom, and paragraph 1309 for knit fabrics

in the piece. Paragraph 1312 provides for "Manufactures of filaments, fibers, yarns, or threads, of rayon or other synthetic textile, and textile products made of bands or strips (not exceeding one inch in width) of rayon or other synthetic textile." Paragraph 1313 provides that "Whenever used in this Act the terms 'rayon' and 'other synthetic textile' mean the product made by any artificial process from cellulose, a cellulose hydrate, a compound of cellulose, or a mixture containing any of the foregoing, *which product is solidified into filaments, fibers, bands, strips, or sheets*, whether such products are known as rayon, staple fiber, visca, or cellophane, or as artificial, imitation, or synthetic silk, wool, horsehair, or straw, or by any other name whatsoever." [Italics ours.]

Paragraph 1305, *supra*, clearly indicates that synthetic textile bands and strips are used in the manufacture of textiles. Such bands and strips are sometimes interwoven into braids. See *Isler & Guye* v. *United States*, 11 Ct. Cust. Appls. 340, T. D. 39146.

Braiding machines are *eo nomine* provided for in paragraph 372 of the Tariff Act of 1930 and in the trade agreement here under consideration and are treated as "textile machinery."

Synthetic textile sheets are slit into film yarns which are used both for weaving and knitting fabrics. They are also slit into narrow widths and used as braid and as insulating material. The slitting is done by machines having a plurality of knives. See American Silk & Rayon Journal, Vol. 55, publications for September 1936, p. 33, and November 1936, pp. 13 to 16, inclusive, and *Isler & Guye* v. *United States, supra*.

It is obvious from what has been said that all of the machines expressly excepted from the operation of the provision contained in the first clause of the trade agreement here under consideration are used in textile manufacturing or processing prior to the making of fabrics and that that clause was not intended to cover looms.

Looms having been expressly excepted from the second clause here under consideration and not having been otherwise provided for in the trade agreement, the involved looms and parts thereof are dutiable, as assessed by the collector and as held by the trial court, at 40 per centum ad valorem under paragraph 372 of the Tariff Act of 1930.

The judgment is *affirmed*.

BLAND, Judge, concurring.

I concur in the conclusion reached by the majority and only wish to emphasize the suggestion that it is erroneous to conclude that unless appellant's contentions as to the construction of the two clauses in controversy are accepted, the anomaly would exist that nothing imported could be regarded as covered by the second clause. The majority's construction of the second clause and its holding that there is room for its operation is supported by a consideration to which the

majority has not seen fit to refer and which I think is wholly competent and proper under the circumstances as they exist.

The Tariff Commission has pointed out that the "textile machinery category" treated by the contracting parties under said second clause might include, for example, such articles as "cloth and yarn measuring and testing machinery, and cloth winders and folders." See the Tariff Commission's "Digests of Trade Data with respect to Products on which Concessions Were Granted by the United States" concerning the "Trade Agreement Between the United States and the United Kingdom," 1938, Vol. IV, p. 3–161. It is also noted that in the same volume, at p. 3–159, the Tariff Commission observed that the first clause above-quoted "provides for equipment which is used in the early stages of manufacture of textile fibers."

Doubtless the trial court did not feel that it was privileged to give consideration to the information furnished by the Tariff Commission, and in this I am of the opinion that it was in error. See *Thorens, Inc.* v. *United States*, C. D. 730, Treas. Dec. Adv. Sheets, Feb. 25, 1943 (aff'd by this court, 31 C. C. P. A. (Customs) 125, C. A. D. 261.

It seems to me that the court is justified in seeking information, if pertinent, from any source from which it may draw light. See *American Net & Twine Co.* v. *Worthington*, 141 U. S. 468. There are never very many extrinsic facts or circumstances from which to draw information helpful in construing provisions in trade agrements of the character here involved, and the field should not be unjustifiably narrowed.

The Code of Federal Regulations, Tit. 22, § 55.3, provides as follows:

55.3 Committee for Reciprocity Information. Persons desiring to present their views with respect to any such proposed [trade] agreement shall present them to a committee to be known as the Committee for Reciprocity Information. Said Committee, hereinafter referred to as the Committee, shall consist of members designated from the personnel of their respective departments or offices by the Secretary of State, the Secretary of Agriculture, the Secretary of Commerce, the National Recovery Administrator, *the Chairman of the Tariff Commission*, the special adviser to the President on foreign trade, and the heads of such other Federal departments or offices as may be named from time to time by the Executive Committee on Commercial Policy. The Committee shall function under the direction and supervision of, and its chairman shall be designated from among the members of the Committee by, the Executive Committee on Commercial Policy. [Italics mine.]

The Tariff Commission obviously furnishes the facts, figures, and complete data on the subject matter under consideration and, as most usually occurs with congressional committees, it would ordinarily prepare the form of the provisions adopted. The Chairman of the Tariff Commission, or someone designated by him from the personnel of that agency, *sits in* on the consideration of the subject matter before the Committee for Reciprocity Information. While the statements

given out by the Tariff Commission and others concerned, before or at the time the trade agreement goes into effect, are pertinent for consideration, unquestionably they cannot be regarded as at all times controlling.

The trade agreement with the United Kingdom was concluded on November 17, 1938. It was to go into effect on January 1, 1939. Previous to its going into effect and subsequent to its promulgation, the Tariff Commission gave out the information above referred to. This was no post-mortem affair. The party who probably knew more about the subject matter involved than anyone else in this country, before any litigation was started and before the agreement went into effect, explained the nature and scope of the trade-agreement provisions. Therefore, I think this subject matter is competent and helpful.

In *Geo. W. Cole & Co. et al.* v. *United States*, 27 C. C. P. A. (Customs) 201, C. A. D. 85, the same principle was involved, and I cannot distinguish the facts and the applicable law there from the facts and the law involved here. There a press release given out by the State Department at the time the text of the trade agreement with Cuba was published was accepted as pertinent upon the theory that it was a statement of a party to the agreement. In that instance the President, and not the State Department, was the contracting party. The same is true here.

The Reciprocal Trade Agreement Act involved here puts all power in the hands of the President. The State Department and the other agencies named are the instruments through which he works. If statements regarding the scope of the provisions recommended to the President by one of the parties are competent, I see no justification for concluding that a statement by the Tariff Commission, such as is involved here, is incompetent.